

# THE ATTORNEY GENERAL

## OF TEXAS

GERALD C. MANN
XXXXXXXXXXXXXXXXXX
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Honorable O. P. Lockhart, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. 0-5182
Re: What is the extent of the trust
fund created by the reinsurance
agreement between the Illinois
Bankers Life Association and
the Illinois Bankers Life As-
surance Company? And related
matters.

Your letter of April 2, 1943, requesting the opin-
ion of this department on the matters stated therein reads
as follows:

"Enclosed in duplicate are photostatic copies of

"1. Reinsurance contract of November 19, 1929
by which the stock life insurance company above named
reinsured and assumed the then existing business of
a mutual assessment life insurance company known as
Illinois Bankers Life Association.

"2. Letter of March 24, 1943 to this Depart-
ment from our Examiner, Mr. Hunter McLean, who is
engaged in a convention examination of the above
named company at this time.

"The reinsurance agreement as a whole (and
especially paragraph 5 thereof) appears plainly to
create a trust; and we certify to you as facts all
of the statements made in Mr. McLean's letter in
so far as they purport to be factual in nature.

"The facts stated by our Examiner seem to
raise the question as to the extent of the trust
fund created by the reinsurance agreement, and
to raise the issue as to whether the stated prac-
tices of the captioned company constitute breaches
of trust under the agreement, and if so wherein
and to what extent.

"We request your opinion upon the matters indicated in the paragraph next preceding, and if possible your answers to the specific questions propounded in our Examiner's letter.

"In connection with the use of the words 'fund' or 'funds' as embracing real estate as well as increments of all kinds growing out of same, as well as other classes or property whether real, personal or mixed: See Sims vs. McMullen, 22 SW (2) 313, 318, modified on other grounds, 37 S. W. (2) 141.

"We respectfully request that your Department use the utmost possible expedition in giving us your opinion upon the matters involved, not only on account of the importance thereof, and the amounts involved, but also because the present convention examination of the company is participated in by the examining authorities of several states wherein the company does business, and we need your opinion as early as possible to guide us in framing the report of such examination which will very soon come to a close."

Sections 2 and 5 of the contract of reinsurance between the Illinois Bankers Life Association and the Illinois Bankers Life Assurance Company are as follows:

"Section 2. IT IS AGREED that upon this contract becoming effective, as hereinafter set forth, the said Association shall, by proper deeds of assignment and transfer, convey and set over to the said Company all of its assets, moneys, notes, bonds, mortgages, securities, judgments, choses in action, real property and property of every kind and character and wheresoever situated, belonging to the said Association."

"Section 5. All the present funds of the Association shall be considered as Trust Funds for the benefit of the members of the Association, and, with accretions thereto and deductions therefrom, shall be invested from time to time in accordance with the provisions of the statute as to the investments of Legal Reserve Life Insurance Companies; and the Company shall, at all times, keep books of account of said funds.

"Accretions shall consist of (A) the assessments and premiums to be paid by continuing members, less contributions to expenses as set forth in Section 4; (B) interest accumulations at the rate of 4½% per annum on the reserves accumulated on the so-called Individual Reserve Policies, and at the rate of 4% per annum on the accumulated savings contributed by holders of Savings Accumulation policies, and at the rate of 3½% per annum on the remainder of such funds, but in no event at a rate greater than the actual net rate of interest earned on the funds, nor less than 3½%; and (C) the surplus earnings provided in Section 6.

"Deductions shall include (D) all policy payments and claims to the said members on the assessment plan and to their beneficiaries; and (E) any amounts apportioned and paid or credited to policies or certificates which may be converted as hereinafter set forth.

"There shall be set up by the Company from the aforesaid Trust Funds the legal reserve from time to time required to be set up to the credit of all policies or certificates assumed hereunder, and the special funds created in connection with policies on the Savings Plan and the reserves on the so-called Individual Reserve policies as provided by the terms of such policies.

"The Company shall have the power, as aforesaid, to invest said funds and to use the said funds, or the income therefrom, for the purpose of maintaining, as far as possible, the said present rates of the said certificates, or for the benefit of the members of the said Association. No dividends shall ever be paid by the said Company out of the funds of the Association or accretions thereto as herein provided."

Section 6 of said contract of reinsurance provides:

"In consideration of said transfer of insurance and of the contributions to expenses herein provided and any excess interest earnings or otherwise, said Company agrees that at the end of each calendar year it will pay into the Trust Fund set apart for the benefit of the members of said Association, that proportion of the surplus earnings of the Company

accumulated during the year, as set forth in the
Annual Statement made in conformity with the require-
ments of the Department of Trade and Commerce of
Illinois, exclusive of dividends paid or apportioned
to participating legal reserve policy holders and
interest earned on the capital and unassigned sur-
plus, that the total assessment premium income of
the year bears to the total renewal premium income
of the Company, including the assessment premium
income."

The letter of March 24, 1943, referred to in the
second paragraph of your letter as quoted above reads in
part as follows:

"There are submitted herewith several ques-
tions arising in the present examination of the
Illinois Bankers Life Assurance Company. The
amount of money involved to date is rather large
and could amount in the future to a very great
amount, and therefore, I seek the opinion of the
Attorney General of Texas to guide me in prepar-
ing the balance sheet of the examination report
and in making demands for performance upon the
officials of the company.

"The Illinois Bankers Life Assurance Company,
a stock company, was incorporated September 13,
1929 under and in accordance with the provisions
of the Illinois legal reserve Act of 1869 and all
amendments thereto. It was organized to reinsure
the business of the Illinois Bankers Life Associa-
tion, an assessment life association operating
under the Illinois assessment Act of 1893.

"The contract of reinsurance was approved by
the members of the Association on November 19,
1929 and by the Illinois Insurance Department on
the same date. The letter approval was given pur-
suant to the provisions of an Illinois statute
entitled 'An Act relating to the consolidation
and reinsurance of insurance Companies, Associa-
tions and Societies,' which was enacted July 1,
1919.

" . . . .

"In the management of the Trust Fund, the
Company has received all income from Trust Fund
real estate and borne all real estate expenses.

At annual accounting dates the Company pays to
the Trust Fund 3½%, or more, interest upon the
book value of the Trust Fund assets, including
its real estate. In the sale of Trust Fund real
estate, profits and losses were considered to be
the gain or loss of the Trust Fund. Although the
contract is not specific in these matters, that
appears to be the implied method to be followed.
Also, there is no question concerning the position
of the Company as a Trustee of the Association's
Trust Funds, and, upon that point, there is no
argument.

"The Trust Fund owns hundreds of farms in
Texas, Oklahoma and Kansas and has owned these
farms since the depression years. It also owns
farms in other States, however we are principally
concerned with the Texas, Oklahoma and Kansas
farm properties and, if given the law in those
States can answer the questions arising in the
remaining States without difficulty.

"The Texas, Oklahoma and Kansas farms have,
in many instances, proven to be in or near oil
development. Thus, high prices have been offered
the Company for the farms, in fee; high prices
have been offered for the mineral rights; high
prices have been offered and received for leases
and much money in delay rentals has been received
under oil leases; and, high prices have been of-
fered for royalty, producing and non-producing.

"Until this time, the Company has taken the
position that all products of an oil play are in-
come and therefore the property of the Trustee
Company, and not the property of the Trust Fund.
These products include lease bonuses, delay rentals,
income from producing royalty, proceeds from the
sale of mineral rights and non-producing royalty.
The Company now concedes, after discussing the
distribution of these proceeds, that the laws of
Texas are such as to vest any of the above pro-
ceeds in the Trust Fund as receipts from the sale
of real estate, be they lease bonuses, delay rentals,
producing royalty, from the sale of mineral interests
or non-producing royalty. However, the Trustee
Company argues that the laws of Oklahoma and
Kansas vary from those of Texas and that in those
two States the proceeds of leases (bonuses and
delay rentals) as well as producing royalty are

income and therefore the property of the the
Trustee Company and not the property of the Trust
Fund received as the proceeds of real estate sales,
or otherwise. The Company now concedes, also,
that proceeds from the sale of mineral rights and
non-producing royalty, in Oklahoma and Kansas, are
property of the Trust Fund as proceeds from the
sale of real estate.

"So far as we have been able to determine,
this is the first time these questions have been
raised or considered by the Company officials.

"The Company has, until recently, consist-
ently refused to sell Trust Fund real estate, even
when offered a fair price. This speculation is
particularly true in the cases of farms within an
oil play area. Numerous offers have been made for
Trust Fund farms, where some oil interest was de-
veloping for amounts well in excess of the value
of the surface rights. In the vast majority of
such instances, the offer was refused and if the
play developed further, a lease was negotiated.
In only two or three instances has the Trustee
Company sold mineral rights or non-producing
royalty, thereby benefiting the Trust Fund, but,
to the contrary, the lands have been held and
leased, the proceeds going to the Trustee Com-
pany. Thus, the position of the Trustee Company,
knowingly or unknowingly, has been to refuse offers
for the sale of real estate that would have benefited
the Trust Fund and hold out for leases and production
that would benefit the Trustee Company.

"In several instances where the surface and
a portion of the minerals in Trust Fund lands
have been sold at a loss subsequent oil develop-
ment produces for the retained mineral interests,
substantial lease bonuses, lease delay rentals
and even producing royalty. These retained min-
eral interests are carried in the Trust Fund at
$1.00 book value, yet under the practice of the
Trustee Company heretofore, all proceeds from
these mineral interests (now admitted not to in-
clude proceeds from the sale of mineral rights
or non-producing royalty) have been credited as
Trustee Company income. Thus, although the as-
set was in the Trust Fund, all proceeds from it
went to the Trustee Company.

"Most of the mortgage loans, through which
this real estate was acquired, were made by the
Illinois Bankers Life Association, the assessment
association, prior to its reinsurance with the
Illinois Bankers Life Assurance Company. It has
developed in this examination that W. H. Woods,
formerly President of the Association, received
a mineral interest in most of the Oklahoma lands
mortgaged to the Association in consideration
for the Association having made the loan. The
demand of these mineral interests by Woods serves
to emphasize that some of the value assigned to
the land at the time of execution of the mort-
gages undoubtedly rested in the possibility of
oil development. Now that such a development has
taken place, the Trust Fund reaps a negligible
part of the benefits.

". . . ."

As we understand your request one of the first ques-
tions presented is whether or not the real estate involved
constitutes a part of the trust fund? It will be noted that
Section 5 of the reinsurance contract expressly provides in
part:

"All the present funds of the Association
shall be considered as Trust Funds for the bene-
fit of the members of the Association. . . ."

Considering Section 5 of the reinsurance contract in connec-
tion with the other provisions of said contract, especially
provision No. 2 and provision No. 6, it is our opinion that
the real estate involved constitutes a part of the trust
funds of the association.

The word "fund" has been defined in several Texas
cases. In the case of Galveston, H. & S. A. Railway Company
v. State, 13 S. W. 619, it is stated in effect that the word
"fund", as used in Vernon's Annotated State Constitution,
Article 7, Section 2, providing for the establishment of a
perpetual school fund, means the entire property from which
money is to be derived for the maintenance of public free
schools, the foundation on which rests the support of the
system of schools which it is made the duty of the Legisla-
ture to establish and maintain.

In the case of Hayes v. Gardner, 40 S. W. (2) 917,
it is stated in effect that the word "funds" as used in the
order directing payment of compensation to a receiver and

the receiver's attorney's fee means cash on hand or personal assets acquired by receiver on account of, and during the operation of the business of the corporation.

In the case of Etter v. Tuck, 91 S. W. (2) 875 it is stated in effect that allegations of a petition by independent executor to enjoin sale under deed of trust of real property belonging to an estate that the estate had no funds with which to pay first and second class claims held sufficient to justify resort to secured real property and temporary restraining order enjoining its sale, since "fund" in its broad meaning includes property of every kind.

In view of the foregoing authorities it is our opinion, as stated above, that the term "funds" as used in the contract of reinsurance is broad enough to include real estate.

It is stated by Bogert in his Text on Trusts and Trustees, Vol. 1, page 1, that

"A trust may be defined as a fiduciary relationship in which one person holds a property interest, subjecto to an equitable obligation to keep or use that interest for the benefit of another. This statement is especially appropriate to the most common type of the trust, namely, the express private trust. . . ."

It is further stated by Bogert in Vol. 1, page 3,

"The trust property is the interest in a thing, real or personal, which the trustee holds, subject to the rights of another.

"It should first be noticed that an interest in specific property, real or personal, is always an element of the trust. . ."

Generally speaking it is stated in Texas Jurisprudence, Vol. 42, page 722, that

"In accounts with the cestui, the trustee is chargeable with all proceeds of the sale of and income from trust property. He is entitled on such accounting to credit for outgoings, such as taxes, insurance, necessary repairs also for the expenses of any litigation, reasonably undertaken, for the protection of trust property. Lost property must be accounted for--that is to say,

the trustee must show that he used care and dili-
gence in the custody and for the preservation
of the property which was lost. As to misappli-
cation of funds, 'the rule of equity is, that all
the gain made by the trustee, by a wrongful appro-
priation of the trust fund, shall go to the cestui
que trust, and all the losses borne by the trustee
himself."

In the case of Murphy-Bolanz Land and Loan Company
v. McKibben, 236 S. W. 78, it is stated among other things:

"There must be no speculation on the part of
the trustee in dealing with the trust fund. The
law does not give to him the same freedom of choice
in making investments which may be and often is
exercised by prudent business men in the conduct
of their own affairs."

It is stated by Bogert in his Text on Trusts and
Trustees, Vol. 4, page 2393,

"It is, of course, common that a trustee who
has a power of sale, but no duty to sell, disposes
of trust property and makes a profit on the sale,
when the sale price is compared with the inventory
or cost price of the property. Such a profit is
quite universally held to go to the capital of the
trust fund. . . ."

In view of the foregoing facts and authorities, as
heretofore stated, it is our opinion that all of the real es-
tate situated in Texas assigned and transferred by the associa-
tion to the Illinois Bankers Life Assurance Company constitutes
a part of the trust fund of the association. It is our further
opinion that the proceeds from lease bonuses, delayed rentals
income from producing royalty, proceeds from sale of mineral
rights and non-producing royalty from Texas lands belong to
and should be credited to the trust fund of the association
and not to the trustee company. However, this opinion is not
to be construed as holding that the trustee company is not
entitled to such expenses as taxes, insurance, necessary
repairs, expenses of any litigation, or any other reasonable
expenses incurred for the protection of the trust property.

It will be noted that the examiner raises several
specific questions in his letter as quoted above. We believe
what has been said above answers his questions in a general
manner except to the law in other states pertaining to such

Honorable O. P. Lockhart, Page 10, (O-5182)


questions. We express no opinion concerning the questions regarding the laws of other states.

Yours very truly

ATTORNEY GENERAL OF TEXAS


By S/ Ardell Williams
Ardell Williams
Assistant

Approved Apr. 19, 1943

S/Gerald C. Mann

Attorney General of Texas

AW:mp:bjb